UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BARBARA DUKA,

                        Plaintiff,

        v.

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15 CV 357

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Barbara Duka ("Ms. Duka"), by and through her counsel, Petrillo Klein & Boxer LLP, for her complaint against the U.S. Securities and Exchange Commission ("SEC" or the "Commission"), alleges as follows:

### Preliminary Statement

1.    Ms. Duka brings this action for declaratory and injunctive relief to prevent the SEC from initiating an action against her in violation of the U.S. Constitution ("Constitution").

2.    The Staff of the Enforcement Division has advised Ms. Duka through counsel that it will recommend to the SEC that it authorize the Staff to file an action before an SEC administrative law judge naming Ms. Duka as a respondent-defendant, and the Commission is scheduled to vote on such recommendation on or about January 20, 2015. Under the Supreme Court's decision in *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 561 U.S. 477 (2010) ("*Free Enterprise*"), administrative proceedings of the kind threatened here violate Article II of the Constitution.

3. As set forth more fully below, SEC administrative law judges ("SEC ALJs"), in connection with their enacted authority to oversee SEC administrative proceedings, are executive branch "officers" for purposes of Article II. Contrary to the Supreme Court's holding in *Free Enterprise*, SEC ALJs enjoy at least two layers of tenure protection. Accordingly, SEC administrative proceedings are unconstitutional because they violate Article II.

4. The SEC is expected to file an administrative proceeding imminently against Ms. Duka.

5. Declaratory and injunctive relief is necessary to prevent Ms. Duka from being compelled to submit to an unconstitutional proceeding.

## Jurisdiction, Venue, and Parties

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1651, 2201 and 5 U.S.C. §§ 702 and 706. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

7. It is necessary and appropriate for this Court to exercise jurisdiction over Ms. Duka's claim because (a) without judicial review at this stage, meaningful judicial review of the claim asserted herein will be foreclosed; (b) Ms. Duka's claim is wholly collateral to the review of provisions of the securities laws; and (c) Ms. Duka's claim is not within the particular expertise of the SEC.

8. Ms. Duka is a citizen of the State of New York and resident of New York County. At all times relevant to this Complaint, Ms. Duka worked in New York as an employee of Standard & Poor's Rating Services ("S&P"), a division of McGraw Hill Financial, Inc., where her work concerned the rating of commercial mortgage backed securities ("CMBS").

9.      The SEC is an agency of the United States government, headquartered in Washington, D.C.

## Background

10.     Ms. Duka joined the CMBS group at S&P in 1998, and, in October 2008, she was promoted to the position of Co-Manager of U.S. CMBS.

11.     From October 2008 through early 2012, Ms. Duka oversaw an analytical group that formulated ratings of CMBS new issuance transactions ("CMBS NI" or "NI"). In addition, in or around March 2011, Ms. Duka was also assigned to oversee an S&P analytical group that performed ratings surveillance of previously issued and rated securities ("Surveillance").

12.     Ms. Duka left the day-to-day employ of S&P in early 2012.

## The SEC's Investigation

13.     In August 2013, under a formal Order of Investigation captioned *In the Matter of Standard & Poor's CMBS Ratings (D-3302)*, the Enforcement Staff served Ms. Duka with a subpoena for testimony and for documents.

14.     From October 22, 2013 through October 25, 2013, Ms. Duka responded in sworn testimony to questions posed by the Staff. The testimony focused principally on (a) a change in S&P's application of the methodology for determining debt service coverage ("DSC"), and (b) the intention behind such change[1] and, relatedly, its disclosure in certain S&P CMBS new issuance ("NI") presale reports[2] published by S&P in 2011.

---

[1]     Because the DSC affects the so-called "credit enhancement levels" determined by S&P, the change in application of the methodology in issue in the investigation had an effect on the credit enhancement levels assigned to different tranches of CMBS rated in 2011, in this case, all things being analytically equal, by lowering them from where they might have otherwise been determined under the CMBS NI model that was in use before the change in application of the DSC methodology.

[2]     S&P presale reports are S&P publications that set forth explanation and analysis underlying S&P's preliminary ratings applicable to particular CMBS new issuance transactions.

3

15. Beginning in approximately August 2014, and continuing through November 2014, Ms. Duka, through counsel, engaged in communications with the Enforcement Staff regarding the investigation. Ms. Duka, through counsel, explained why the filing of an action against Ms. Duka would be unwarranted, including, in summary form, because:

   a. The record evidence is abundant that Ms. Duka and other members of the CMBS NI group reasonably believed that the change in application of the methodology was analytically correct, and that it would replace an analytically inferior application of the methodology;

   b. Ms. Duka reviewed the then-proposed change in application of the methodology with two control/compliance functions at S&P, the Criteria group and the Quality group, and reasonably believed that individuals within those functions (a) concurred with the analytical judgment that underpinned the change in application of the methodology, and (b) would review S&P's disclosure of the change in application of the methodology in its presale reports.

   c. The change in application of the methodology did not alter the ultimate S&P ratings as determined by S&P, when the analysis was re-run in August 2011 using the CMBS Surveillance methodology in place at the time (which did not adjust the DSCR as NI adjusted it);

   d. None of the CMBS transactions that were the subject of the presale reports at issue has failed to perform, and all but one was rated by at least one additional rating agency; put differently, no investors suffered damages as a result of Ms. Duka's alleged conduct;

   e. The Staff's theory that the analytic change in calculating DSC was motivated by S&P commercial goals is belied by the fact that the CMBS group, under Ms. Duka's direction, generally employed a more conservative rating methodology than was required to under S&P's criteria for rating CMBS NI transactions;

   f. Ms. Duka believed in good faith that the initial presales disclosed the change in application of the methodology in the "Conduit/fusion methodology" section of the presales and enhanced such disclosure as additional presales were finalized; and

   g. Based on S&P disclosure standards in 2011, as documented in numerous published ratings and ratings-related reports, Ms. Duka reasonably believed that the manner in which she disclosed the change in calculating DSC was appropriate.

4

16. On November 18, 2014, the Staff issued a *Wells* notice indicating that it had determined to recommend that the Commission file an enforcement action against Ms. Duka alleging violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and aiding and abetting and causing violations by S&P of Section 15E(c)(3) of the Exchange Act, Exchange Act Rules 17g-6(a)(2), 17g-2(a)(6), and 17g-2(a)(2)(iii).

17. On December 3, 2014, Ms. Duka, through counsel, submitted a memorandum in response to the *Wells* notice.

18. The Staff subsequently informed counsel for Ms. Duka, on several occasions, that should the Commission authorize an enforcement action against Ms. Duka, the SEC would file an administrative action before an SEC ALJ.

19. On information and belief, the SEC, on January 20, 2015, or shortly thereafter, will consider a Staff recommendation and vote to proceed with an enforcement action against Ms. Duka, based on some or all of the above-cited allegations, by way of an administrative proceeding before an SEC ALJ.

**SEC Administrative Proceedings**

20. An administrative proceeding before an SEC ALJ is markedly different from a civil action litigated in federal court.

21. Unlike in federal court, a respondent in an administrative proceeding is not entitled to a trial by jury. Instead, in an administrative proceeding, the SEC ALJ serves as finder of fact and of law.

22. SEC administrative proceedings are governed by the SEC's Rules of Practice ("Rules of Practice"), which differ from the Federal Rules of Civil Procedure ("Federal Rules") that apply to civil actions in federal court.

23. In contrast with a proceeding in federal court under the Federal Rules, the Rules of Practice do not provide respondents the opportunity to test the legal sufficiency of the SEC's administrative complaint by way of a motion to dismiss, which are available in federal court.

24. The Rules of Practice prohibit respondents from asserting counterclaims against the SEC, whereas, in federal court, a defendant may assert counterclaims against a plaintiff.

25. The Rules of Practice provide for limited discovery. Unlike in federal court, depositions are generally not permitted. Rules of Practice 233, 234.

26. Administrative hearings occur on a more expedited schedule than civil actions in federal court. The Rules of Practice require the hearing to take place, at most, approximately four months from the issuance of the SEC's Order Instituting Proceedings ("OIP"). In its discretion, the SEC can require the hearing to occur as early as one month after the OIP is issued. The SEC is not required to begin making available to a respondent the limited discovery afforded in an administrative proceeding until seven days after the OIP is issued.

27. Unlike in federal court, the Federal Rules of Evidence do not apply in administrative proceedings. Instead, any evidence, including hearsay, that "can conceivably throw any light upon the controversy' should normally be admitted in [administrative] proceedings." *In the Matter of Donald T. Sheldon, et al.*, Release No. 275 (Mar. 19, 1987).

28. Any appeal from the SEC ALJ's decision would be heard by the SEC itself, the very body that earlier determined that an enforcement action was warranted, and the SEC is empowered to decline to hear the appeal or to impose even greater sanctions. *See* Rules of

6

Procedure 410, 411. A final order of the Commission, after it is effective, may then be appealed to a United States Court of Appeals. *See* 15 U.S.C. § 78y(a)(1), 15 U.S.C. § 77i.

## The Broad and Substantial Powers of the ALJ

29. SEC ALJs, who preside over administrative proceedings, exercise the type and degree of authority and discretion that render them officers for purposes of Article II of the U.S. Constitution.

30. SEC ALJs are empowered with broad discretion to exercise significant authority regarding administrative proceedings. Under the SEC Rules of Practice, an SEC ALJ – referred to in the Rules of Practice as the "hearing officer" – is empowered, within his or her discretion, to perform the following functions, among other things:

   a. Regulate the course of a proceeding and the conduct of the parties and their counsel (Rules of Practice 111(d));

   b. Receive "relevant evidence" and rule upon "the admission of evidence and offers of proof" (Rules of Practice 111(c));

   c. Issue subpoenas and order production of evidence (Rules of Practice 111(b); 230(a)(2); 232);

   d. Issue orders, including orders to show-cause (Rules of Practice 141(b); *see In the Matter of China Everhealth Corp., Genovabiotherapeutics, Inc., Glacier Enterprises, Inc., Green Asia Res., Inc., Jesup & Lamont, Inc., & Panoshan Mktg. Corp.*, Release No. 661 (Sept. 2, 2014));

   e. Rule on requests and motions, including pre-trial motions for summary disposition (*See, e.g.*, Rules of Practice 250);

   f. Amend the SEC's OIP (Rules of Practice 200(d)(2));

   g. Impose sanctions on parties for contemptuous conduct (Rules of Practice 180(a));

   h. Enter orders of default, and rule on motions to set aside default (Rules of Practice 155);

   i. Consolidate proceedings (Rules of Practice 201(a));

7

j. Require the SEC to file a more definite statement of specified matters of fact or law to be considered or determined (Rules of Practice 220(d));

k. Order depositions, and act as the "deposition officer" (Rules of Practice 233, 234)

l. Regulate the production of documents in the proceeding (Rules of Practice 230(g));

m. Issue protective orders governing confidentiality of documents (Rules of Practice 322); and

n. Regulate the scope of cross-examination (Rules of Procedure 326).

31. At the close of an administrative proceeding, the SEC ALJ issues a decision, referred to in the Rules of Practice as the "initial decision." Rules of Practice 360. The initial decision states the time period within which a petition for Commission review of the initial decision may be filed.

32. The initial decision becomes the final decision of the SEC after the period to petition for review expires, unless the Commission determines to review the SEC ALJ's decision.

33. With certain exceptions that do not apply to this matter, the Commission is not required to review any SEC ALJ's decision for review.

34. As applied to this matter, Commission review is entirely discretionary. The Commission may deny a petition for review for any reason, after considering whether the petition for review makes a reasonable showing that (i) the decision embodies a clearly erroneous finding of material fact, an erroneous conclusion of law, or an exercise of discretion or decision of law or policy that is "important"; or (ii) a prejudicial error was committed during the proceeding. Rules of Procedure 411.

35. If no party requests review, and if the Commission does not undertake review on its own initiative, no Commission review occurs. Instead, the Commission enters an Order that

the decision has become final, and "the action of [the] administrative law judge ... shall, for all purposes, including appeal or review thereof, be deemed the action of the Commission." 15 U.S.C. § 78d-1(c). The order of finality states the date on which sanctions imposed by the SEC ALJ, if any, will become effective. Rules of Practice 360(d)(2).

### The Position of SEC ALJ

36. The SEC is a "Department" of the Executive Branch of the U.S. Government. The individual Commissioners are the "heads" of the Department. *Free Enterprise*, 130 S. Ct. at 3163.

37. Pursuant to the authority granted to the SEC by 5 U.S.C. § 3105, the Commissioners appoint SEC ALJs. *See* 5 U.S.C. § 3105 ("Each agency shall appoint as many administrative law judges as are necessary for proceedings required to be conducted in accordance with sections 556 and 557 of this title.").

38. The Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., establishes ALJs' powers with respect to adjudication. 5 U.S.C. §§ 556, 557. The securities laws empower the SEC to delegate certain functions to SEC ALJs, including those listed above at paragraphs 30a through 30n. *See* 15 U.S.C. §78d-1.

39. SEC regulation establishes the "Office of Administrative Law Judges," and outlines their authority. *See, e.g.*, 17 C.F.R. § 200.14; 17 C.F.R. § 200.30-9; 17 C.F.R. § 201.111. Those regulations provide that SEC ALJs' authority with respect to adjudications is to be as broad as the APA allows. 17 C.F.R. § 201.111 ("No provision of these Rules of Practice shall be construed to limit the powers of the hearing officer provided by the Administrative Procedure Act, 5 U.S.C. 556, 557.").

40.     The salary of SEC ALJs is specified by statute. There are eight levels of basic pay for ALJs, the lowest of which may not be less than 65% of the rate of basic pay for level IV of the Executive Schedule, and the highest of which may not be more than the rate of basic pay for level IV of the Executive Schedule. 5 U.S.C. § 5372. (The Executive Schedule is a system of salaries given to the highest-ranked appointed positions in the executive branch of the U.S. government. 5 U.S.C. § 5311.)

41.     The manner of appointment of an ALJ is specified by statute. Appointments are made by agencies based on need. 5 U.S.C. § 3105. By regulation, ALJs may be appointed only from a list of eligible candidates provided by the Office of Personnel Management ("OPM") or with prior approval of OPM. 5 C.F.R. § 930.204. OPM selects eligible candidates based on a competitive exam, which OPM develops and administers. The SEC, like other agencies, selects ALJs from OPM's list of eligible candidates, based on the SEC's need. 5 U.S.C. § 3105; 5 C.F.R. § 930.204.

42.     All ALJs receive career appointments and are exempt from probationary periods that apply to certain other government employees. 5 C.F.R. § 930.204(a). They do not serve time-limited terms.

43.     Under the statutory and regulatory regime governing their duties and authority, their appointment, and salary, and their power, in certain instances, to issue the final decision of the agency, SEC ALJs are "officers" of the United States. They exercise significant authority, are empowered with broad discretion, are appointed as career adjudicators, and are appointed by the heads of an Executive Department.

**Removal of SEC ALJs**

44.     SEC ALJs are removable from their position by the SEC "only" for "good cause," which must be "established and determined" by the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 7521(a).

45.     This removal procedure involves two or more "levels" of tenure protection, as referred to in *Free Enterprise*.

46.     First, as noted, SEC ALJs are protected by statute from removal absent "good cause." 5 U.S.C. § 7521(a).

47.     Second, the SEC Commissioners, who exercise the power of removal, are themselves protected by tenure. They may not be removed by the President from their position except for "inefficiency, neglect of duty, or malfeasance in office." *See, e.g.*, Free Enterprise, 130 S. Ct. at 3148; *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619-20 (2d Cir. 2004).

48.     Third, members of the MSPB, who determine whether sufficient "good cause" exists to remove an SEC ALJ, are also protected by tenure. They are removable by the President "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

**The Removal Regime Applicable to SEC ALJs Violates Article II's Conferral of Executive Power in the President of The United States**

49.     As executive officers, in accordance with the Supreme Court's analysis and holding in *Free Enterprise*, SEC ALJs may not be protected by more than one layer of tenure protection.

50.     Article II of the U.S. Constitution vests "[t]he executive Power ... in a President of the United States of America," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; id., § 3. In light of "[t]he impossibility that one man should be able to perform all the great business of the State," the Constitution provides for executive officers to

11

"assist the supreme Magistrate in discharging the duties of his trust." 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939); *see also Free Enterprise*, 561 U.S. 477, 130 S. Ct. at 3146.

51. Article II's vesting authority requires that the principal and inferior officers of the Executive Branch be answerable to the President and not be separated from the President by attenuated chains of accountability. In particular, as the Supreme Court held in *Free Enterprise*, Article II requires that executive officers, who exercise significant executive power, be unprotected from removal by their superiors at will, when those superiors are themselves protected from removal by the President at will.

52. SEC ALJs, both generally and in this matter, exercise significant executive power.

53. The removal standards applicable to SEC ALJs are unconstitutional because SEC ALJs are inferior officers for purposes of Article II, Section 2 of the U.S. Constitution, and because:

   a. SEC ALJs are protected from removal by a statutory "good cause" standard;

   b. The SEC Commissioners who are empowered to seek removal of SEC ALJs – within the constraints of the "good cause" standard – are themselves protected from removal by a standard of "inefficiency, neglect of duty, or malfeasance in office;" and

   c. The MSPB members who are empowered to effectuate the removal decision – again governed and limited by a "good cause" standard – are themselves protected from removal by an "inefficiency, neglect of duty, or malfeasance in office" standard.

54. Under this attenuated removal scheme, "the President cannot remove an officer who enjoys more than one level of good-cause protection, even if the President determines that the officer is neglecting his duties or discharging them improperly. That judgment is instead committed to another officer, who may or may not agree with the President's determination, and

whom the President cannot remove simply because that officer disagrees with him. This contravenes the President's 'constitutional obligation to ensure the faithful execution of the laws.'" *Free Enterprise*, 130 S. Ct. at 3147 (quoting *Morrison v. Olson*, 487 U.S. 654, 693 (1988)).

55. Because the President cannot oversee SEC ALJs in accordance with Article II, SEC administrative proceedings violate the Constitution.

### The SEC's Initiation of an Administrative Proceeding Will Cause Ms. Duka Severe and Irreparable Harm

56. Absent injunctive relief from this Court, Ms. Duka will be required to submit to an unconstitutional proceeding. This constitutional violation, standing alone, would constitute an irreparable injury. The absence of traditional procedural safeguards in SEC administrative proceedings further exacerbates that irreparable harm.

57. Additionally, were the SEC permitted to pursue an administrative proceeding while the instant complaint is pending, Ms. Duka would be denied any possibility of review until an appeal to a federal circuit court of appeals. The substantial litigation and resource burdens incurred during an administrative proceeding would eventually be for naught, given the unconstitutionality of the administrative proceeding, and then, after time-consuming and burdensome administrative proceedings, the SEC likely would attempt to bring a new case in federal court. Two litigations of this matter would compound costs, lost time, and reputational risk to Ms. Duka.

58. And, were Ms. Duka to fail to prevail in an administrative proceeding, the damage could be severe and irreversible. The result would be public, thus damaging her reputation, and any sanctions could cause damage well before Ms. Duka could obtain meaningful judicial review of her Article II claim. The availability of an appeal after an administrative proceeding to a

federal circuit court of appeals does not address this harm because the administratively-imposed sanction already may have taken effect – and the damage therefore already substantially and harmfully done – by the time the appellate court were to rule.

59. Likewise, the harm threatened here cannot be remedied after the fact by money damages. Governmental immunity doctrines substantially constrain Ms. Duka's ability to seek damages from the SEC. Furthermore, even if money damages were available, the reputational harm to Ms. Duka should the SEC impose administrative sanctions would likely be impossible to monetize.

60. By contrast, the SEC will suffer **no** harm from a pause in an administrative proceeding against Ms. Duka pending final resolution of the constitutional issue presented here. Indeed, any such claim of harm would be fanciful, given that the SEC may proceed now in federal court. Moreover, the presales that are the subject of the SEC's investigation and imminent enforcement action were issued approximately four years ago and have caused no pecuniary harm to investors, who hold performing securities. Therefore, no investor would be adversely affected by the requested injunctive relief.

## COUNT ONE
## APPLICATION FOR INJUNCTIVE RELIEF

61. Plaintiff repeats and re-alleges paragraphs 1 - 60 as if set forth in full.

62. Plaintiff's constitutional rights will be irreparably harmed if a permanent injunction (and, if necessary, a preliminary injunction and temporary restraining order) are not issued against the SEC's administrative proceeding. Plaintiff has a substantial likelihood of success on the merits of her claim. Plaintiff will be irreparably injured without injunctive relief, as described above, and the harm to Plaintiff, absent injunctive relief, far outweighs any harm to the SEC (of which there can be none in this case) arising from an injunction. Finally, issuance of

an injunction will serve the public interest in protecting the rights of citizens under the Constitution and promoting respect for law.

## COUNT TWO
## DECLARATORY JUDGMENT

63.　Plaintiff repeats and re-alleges paragraphs 1 - 62 as if set forth in full.

64.　Plaintiff respectfully requests a declaratory judgment that the statutory and regulatory provisions providing for the position and tenure protections of SEC ALJs are unconstitutional.

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.　An order and judgment declaring unconstitutional the statutory and regulatory provisions providing for the position and tenure protection of the SEC ALJ.

B.　An order and judgment enjoining the Commission from carrying out an administrative proceeding against Plaintiff.

C.　Such other and further relief as this Court may deem just and proper, including reasonable attorneys' fees and the costs of this action.

PETRILLO KLEIN & BOXER LLP

By: /s/ M. Petrillo
Guy Petrillo
(gpetrillo@pkbllp.com)

Nelson Boxer
(nboxer@pkbllp.com)

Dan Goldman
(dgoldman@pkbllp.com)

655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0331
Facsimile:  (212) 370-0391

*Attorneys for Barbara Duka*