UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
BARBARA DUKA, :
:
Plaintiff, :       **AMENDED COMPLAINT FOR**
:                  **DECLARATORY AND**
v. :               **INJUNCTIVE RELIEF**
:
U.S. SECURITIES AND EXCHANGE :
COMMISSION, :
:
Defendant. :
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Barbara Duka ("Ms. Duka"), by and through her counsel, Petrillo Klein & Boxer LLP,

for her amended complaint against the U.S. Securities and Exchange Commission ("SEC" or the

"Commission"), alleges as follows:

## Preliminary Statement

1.      Ms. Duka brings this action for declaratory and injunctive relief to prevent the

SEC from continuing the administrative proceeding it initiated against her in the matter

captioned *In the Matter of Barbara Duka*, Admin. Proc. File No. 3-16349 (Jan. 21, 2015) (the

"Administrative Proceeding").

2.      The Administrative Proceeding violates Article II of the U.S. Constitution, which

states that the "executive Power shall be vested in a President of the United States of America,"

U.S. Const., art. II, § 1, and that "the Congress may by Law vest the Appointment of such

inferior Officers, as they think proper, ... in the Heads of Departments," *id.* § 2, cl. 2.

3.      As set forth more fully below, SEC administrative law judges ("SEC ALJs"), in

connection with their authority to oversee SEC administrative proceedings and their significant

executive powers in connection therewith, are executive branch "officers" for purposes of Article II.

4.      The Supreme Court has held that the Commission is a "Department" of the United States, and that the Commissioners collectively function as the "Head" of the Department with authority to appoint such "officers" as Congress authorizes through legislation.  *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 561 U.S. 477 (2010) ("*Free Enterprise*").

5.      In contravention of the Appointments Clause, SEC ALJs have not been appointed by the SEC Commissioners.  And, contrary to the Supreme Court's holding in *Free Enterprise*, SEC ALJs enjoy at least two layers of tenure protection.  Accordingly, the Administrative Proceeding is unconstitutional because it violates Article II.

6.      In violation of 15 U.S.C. § 78d-1(a), the SEC Commissioners have delegated their authority to appoint SEC ALJs without evidencing such delegation "by published order or rule."

7.      Declaratory and immediate injunctive relief are necessary to prevent Ms. Duka from continuing to be compelled to submit to the unconstitutional and unlawful Administrative Proceeding.

## Jurisdiction, Venue, and Parties

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1651, 2201 and 5 U.S.C. §§ 702 and 706.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

9.      It is necessary and appropriate for this Court to exercise jurisdiction over Ms. Duka's claim because (a) without judicial review at this stage, meaningful judicial review of the claim asserted herein will be foreclosed; (b) Ms. Duka's claim is wholly collateral to the review

of provisions of the securities laws; and (c) Ms. Duka's claim is not within the particular expertise of the SEC.

10.     Ms. Duka is a citizen of the State of New York and resident of New York County. At all times relevant to this Complaint, Ms. Duka worked in New York as an employee of Standard & Poor's Rating Services ("S&P"), a division of McGraw Hill Financial, Inc., where her work concerned S&P's rating of commercial mortgage backed securities ("CMBS").

11.     The SEC is an agency of the United States government, headquartered in Washington, D.C.

**Background**

12.     Ms. Duka joined the CMBS group at S&P in 1998, and, in October 2008, she was promoted to the position of Co-Manager of U.S. CMBS.

13.     From October 2008 through early 2012, Ms. Duka oversaw an analytical group that formulated ratings of CMBS new issuance transactions ("CMBS NI"or "NI").   In addition, in early 2011, Ms. Duka was also assigned to oversee an S&P analytical group that performed ratings surveillance of previously issued and rated securities ("Surveillance").

14.     Ms. Duka left the day-to-day employ of S&P in early 2012.

**The SEC's Investigation**

15.     In August 2013, under a formal Order of Investigation captioned *In the Matter of Standard & Poor's CMBS Ratings (D-3302)*, the Enforcement Staff served Ms. Duka with a subpoena for testimony and for documents.

16.     From October 22, 2013 through October 25, 2013, Ms. Duka responded in sworn testimony to questions posed by the Staff.  The testimony focused principally on (a) a change in S&P's application of the methodology for determining debt service coverage ("DSC"), and (b)

the intention behind such change[1] and, relatedly, its disclosure in certain S&P CMBS new issuance presale reports[2] published by S&P in 2011.

17.     Beginning in approximately August 2014, and continuing through November 2014, Ms. Duka, through counsel, engaged in communications with the Enforcement Staff regarding the investigation.  Ms. Duka, through counsel, explained why the filing of an action against Ms. Duka would be unwarranted, including, in summary form, because:

    a.  The record evidence is abundant that Ms. Duka and other members of the CMBS NI group reasonably believed that the change in application of methodology for determining the DSC was analytically correct, and that it would replace an analytically inferior application of the methodology;

    b.  Ms. Duka reviewed the then-proposed change in application of the methodology with two control/compliance functions at S&P, the Criteria group and the Quality group, and reasonably believed that individuals within those functions (a) concurred with the analytical judgment that underpinned the change in application of methodology, and (b) would review S&P's disclosure of the change in application of methodology in its presale reports.

    c.  The change in application of methodology did not alter the ultimate S&P ratings as determined by S&P, when the analysis was re-run in August 2011 using the CMBS Surveillance methodology in place at the time (which did not adjust the DSC as NI adjusted it);

    d.  None of the CMBS transactions that were the subject of the presale reports at issue has failed to perform, and all but one was rated by at least one additional rating agency; put differently, no investors suffered damages as a result of the conduct alleged by the SEC;

    e.  The Staff's theory that the analytic change in calculating DSC was motivated by S&P commercial goals is belied by the fact that the CMBS group, under Ms. Duka's direction, generally employed a more conservative rating methodology than was required to under S&P's published criteria for rating CMBS NI transactions;

---

[1]     Because the DSC affects the so-called "credit enhancement levels" determined by S&P, the change in application of methodology in issue had an effect on the credit enhancement levels assigned to different tranches of CMBS rated in 2011, in this case, all things being analytically equal, by lowering them from where they might have otherwise been determined under the CMBS NI model that was in use before the change in application of the DSC methodology.

[2]     S&P presale reports are S&P publications that set forth explanation and analysis underlying S&P's preliminary ratings applicable to particular CMBS new issuance transactions.

      f.    Ms. Duka believed in good faith that the initial presales disclosed the change in application of the methodology in the "Conduit/fusion methodology" section of the presales and, consistent with her good faith, enhanced such disclosure as additional presales were finalized; and

      g.   Based on S&P disclosure standards in 2011, as documented in numerous published ratings and ratings-related reports, Ms. Duka reasonably believed that the manner in which she disclosed the change in calculating DSC was appropriate.

18.     On November 18, 2014, the Staff issued a *Wells* notice indicating that it had determined to recommend that the Commission file an enforcement action against Ms. Duka alleging violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and aiding and abetting and causing violations by S&P of Section 15E(c)(3) of the Exchange Act, Exchange Act Rules 17g-6(a)(2), 17g-2(a)(6), and 17g-2(a)(2)(iii).

19.     On December 3, 2014, Ms. Duka, through counsel, submitted a memorandum in response to the *Wells* notice.

### The Administrative Proceeding

20.     On January 21, 2015, the SEC commenced the Administrative Proceeding by issuing an Order Instituting Proceedings ("OIP") against Ms. Duka.

21.     On January 22, 2015, the SEC issued an Order Scheduling Hearing and Designating Presiding Judge, whereby the SEC ordered that Administrative Law Judge Cameron Elliot preside over the Administrative Proceeding.

22.     On March 4, 2015, Judge Elliot issued an order that scheduled the hearing in the Administrative Proceeding to commence on September 16, 2015, and directed the parties to file witness lists, exhibit lists, and expert reports by August 12, 2015.

## SEC Administrative Proceedings

23.     An administrative proceeding before an SEC ALJ is markedly different from a civil action litigated in federal court.

24.     Unlike in federal court, a respondent in an administrative proceeding is not entitled to a trial by jury.  Instead, in an administrative proceeding, the SEC ALJ serves as finder of fact and of law.

25.     SEC administrative proceedings are governed by the SEC's Rules of Practice ("Rules of Practice"), which differ from the Federal Rules of Civil Procedure ("Federal Rules") that apply to civil actions in federal court.

26.     In contrast with a proceeding in federal court under the Federal Rules, the Rules of Practice do not provide respondents the opportunity to test the legal sufficiency of the SEC's administrative complaint by way of a motion to dismiss, which is available in federal court.

27.     The Rules of Practice prohibit respondents from asserting counterclaims against the SEC, whereas, in federal court, a defendant may assert counterclaims against a plaintiff.

28.     The Rules of Practice provide for limited discovery.  Unlike in federal court, depositions are generally not permitted.  Rules of Practice 233, 234.

29.     Administrative hearings occur on a more expedited schedule than civil actions in federal court.  The Rules of Practice require the hearing to take place, at most, approximately four months from the issuance of the SEC's OIP.  In its discretion, the SEC can require the hearing to occur as early as one month after the OIP is issued.  The SEC is not required to begin making available to a respondent the limited discovery afforded in an administrative proceeding until seven days after the OIP is issued.

30.     Unlike in federal court, the Federal Rules of Evidence do not apply in administrative proceedings.  Instead, any evidence, including hearsay, that "can conceivably throw any light upon the controversy' should normally be admitted in [administrative] proceedings." *In the Matter of Donald T. Sheldon, et al.*, Release No. 275 (Mar. 19, 1987).

31.     Any appeal from the SEC ALJ's decision would be heard by the SEC itself, the very body that earlier determined that an enforcement action was warranted, and the SEC is empowered to decline to hear the appeal or to impose even greater sanctions than imposed by the ALJ.  *See* Rules of Practice 410, 411.  A final order of the Commission, after it is effective, may then be appealed to a United States Court of Appeals.  *See* 15 U.S.C. § 78y(a)(1), 15 U.S.C. § 77i.

### The Broad and Substantial Powers of the ALJ

32.     SEC ALJs, who preside over administrative proceedings, exercise the type and degree of authority and discretion that render them officers for purposes of Article II of the U.S. Constitution.

33.     SEC ALJs are empowered with broad discretion to exercise significant authority regarding administrative proceedings.  Under the SEC Rules of Practice, an SEC ALJ – referred to in the Rules of Practice as the "hearing officer" – is empowered, within his or her discretion, to perform the following functions, among other things:

    a.  Regulate the course of a proceeding and the conduct of the parties and their counsel (Rules of Practice 111(d));

    b.  Receive "relevant evidence" and rule upon "the admission of evidence and offers of proof" (Rules of Practice 111(c));

    c.  Issue subpoenas and order production of evidence (Rules of Practice 111(b); 230(a)(2); 232);

    d.  Issue orders, including orders to show-cause (Rules of Practice 141(b); *see In the Matter of China Everhealth Corp., Genovabiotherapeutics, Inc., Glacier Enterprises, Inc., Green Asia Res., Inc., Jesup & Lamont, Inc., & Panoshan Mktg. Corp.*, Release No. 661 (Sept. 2, 2014));

    e.  Rule on requests and motions, including pre-trial motions for summary disposition (*See, e.g.*, Rules of Practice 250);

    f.  Amend the SEC's OIP (Rules of Practice 200(d)(2));

    g.  Impose sanctions on parties for contemptuous conduct (Rules of Practice 180(a));

    h.  Enter orders of default, and rule on motions to set aside default (Rules of Practice 155);

    i.  Consolidate proceedings (Rules of Practice 201(a));

    j.  Require the SEC to file a more definite statement of specified matters of fact or law to be considered or determined (Rules of Practice 220(d));

    k.  Order depositions, and act as the "deposition officer" (Rules of Practice 233, 234);

    l.  Regulate the production of documents in the proceeding (Rules of Practice 230(g));

    m.  Issue protective orders governing confidentiality of documents (Rules of Practice 322); and

    n.  Regulate the scope of cross-examination (Rules of Practice 326).

34.    At the close of an administrative proceeding, the SEC ALJ issues a decision, referred to in the Rules of Practice as the "initial decision." Rules of Practice 360. The initial decision states the time period within which a petition for Commission review of the initial decision may be filed.

35.    The initial decision becomes the final decision of the SEC after the period to petition for review expires, unless the Commission determines to review the SEC ALJ's decision.

36.     With certain exceptions that do not apply to this matter, the Commission is not required to review any SEC ALJ's decision for review.

37.     As applied to this matter, Commission review is entirely discretionary.  The Commission may deny a petition for review for any reason, after considering whether the petition for review makes a reasonable showing that (i) the decision embodies a clearly erroneous finding of material fact, an erroneous conclusion of law, or an exercise of discretion or decision of law or policy that is "important"; or (ii) a prejudicial error was committed during the proceeding.  Rules of Practice 411.

38.     If no party requests review, and if the Commission does not undertake review on its own initiative, no Commission review occurs.  Instead, the Commission enters an Order that the decision has become final, and "the action of [the] administrative law judge ... shall, for all purposes, including appeal or review thereof, be deemed the action of the Commission." 15 U.S.C. § 78d-1(c).  The order of finality states the date on which sanctions imposed by the SEC ALJ, if any, will become effective. Rules of Practice 360(d)(2).

### The Position of SEC ALJ

39.     The ALJ position is established by statute, which provides that each agency "shall" appoint as many ALJs as necessary for the agency's administrative proceedings. 5 U.S.C. § 3105.

40.     The Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, establishes ALJs' powers with respect to adjudication. 5 U.S.C. §§ 556, 557.  The securities laws empower the SEC to delegate certain functions to SEC ALJs, including those listed above at paragraphs 30a through 30n.  *See* 15 U.S.C. § 78d-l.

41.     SEC regulation establishes the "Office of Administrative Law Judges," and outlines their authority. *See, e.g.*, 17 C.F.R. § 200.14; 17 C.F.R. § 200.30-9; 17 C.F.R. § 201.111.  Those regulations provide that SEC ALJs' authority with respect to adjudications is to be as broad as the APA allows. 17 C.F.R. § 201.111 ("No provision of these Rules of Practice shall be construed to limit the powers of the hearing officer provided by the Administrative Procedure Act, 5 U.S.C. 556, 557.").

42.     ALJs are paid according to a statutorily prescribed pay schedule.  5 U.S.C. § 5372; 5 C.F.R. §§ 930.205, 206; *see also* http://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/factsheets/administrative-law-judge-pay-system/ (ALJ pay system).

43.     All ALJs receive career appointments and are exempt from probationary periods that apply to certain other government employees. 5 C.F.R. § 930.204(a).  They do not serve time-limited terms.

44.     Under the statutory and regulatory regime governing their duties and authority, their salary, and their power, including, in certain instances, to issue the final decision of the agency, SEC ALJs are "officers" of the United States.

### The Appointment Process for SEC ALJs

45.     In a recent filing made by the SEC in connection with the matter captioned *In the Matter of Timbervest, LLC et al.*, Admin. Proc. File No. 3-15519, which is annexed as Exhibit 1, the SEC described how ALJ Elliot was hired as an SEC ALJ as follows:

> Pursuant to current statutes and regulations, the hiring process for Commission ALJs is overseen by the U.S. Office of Personnel Management ("OPM"), which administers the competitive examination for selecting all ALJs across the federal government. *See* 5 U.S.C. §§ 1104, 1302; 5 C.F.R. § 930.201(d)-(e).  As do other agencies, the Commission hires its ALJs through this OPM process.  *See* 5 U.S.C. § 3105; 5 C.F.R. § 930.201(f).  When the Commission seeks to hire a new ALJ, Chief ALJ Murray obtains from OPM a list of eligible candidates; a selection is made from the top three candidates on that list.  *See* 5 U.S.C. §§ 3317, 3318; 5

C.F.R. §§ 332.402, 332.404, 930.204(a).  Chief ALJ Murray and an interview committee then make a preliminary selection from among the available candidates.  Their recommendation is subject to final approval and processing by the Commission's Office of Human Resources.  It is the Division's understanding that the above process was employed as to ALJ Elliot, who began work at the agency in 2011.

Ex. 1 at 2.

46.     In the same filing, Jayne L. Seidman, the Deputy Chief Operating Officer of the SEC, admitted in an Affidavit that "ALJ Elliot was not hired through a process involving the approval of the individual members of the Commission."  *See* Ex. 1.

### The Appointment Process for SEC ALJs Violates the Appointments Clause of Article II

47.     The Appointments Clause "is a bulwark against one branch aggrandizing its power at the expense of another branch," and "preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power." *Ryder v. United States*, 515 U.S. 177, 182, 115 S. Ct. 2031, 2035 (1995) (internal quotation marks omitted).

48.     The SEC is a "Department" of the Executive Branch of the U.S. Government. The Commissioners collectively function as the "Head" of the Department.  *Free Enterprise*, 130 S. Ct. at 3163, 561 U.S. at 512-513.

49.     Because SEC ALJs are "officers" of the United States, the Appointments Clause requires that SEC ALJs be appointed by the SEC Commissioners.

50.     The SEC Commissioners did not appoint ALJ Elliot, who presides over the Administrative Proceeding, *see* Ex. 1, and, on information and belief, the SEC Commissioners did not appoint any of the other SEC ALJs.

51.     That SEC ALJ Elliot was not appointed in accordance with the Appointments Clause renders the Administrative Proceeding constitutionally defective.

**Removal of SEC ALJs**

52.     SEC ALJs are removable from their position by the SEC "only" for "good cause," which must be "established and determined" by the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 7521(a).

53.     This removal procedure involves two or more "levels" of tenure protection, as referred to in *Free Enterprise*.

54.     First, as noted, SEC ALJs are protected by statute from removal absent "good cause." 5 U.S.C. § 7521(a).

55.     Second, the SEC Commissioners, who exercise the power of removal, are themselves protected by tenure.  They may not be removed by the President from their position except for "inefficiency, neglect of duty, or malfeasance in office." *See, e.g.*, *Free Enterprise*, 130 S. Ct. at 3148; *MFS Sec. Corp. v. SEC*, 380 F.3d 611,619-20 (2d Cir. 2004).

56.     Third, members of the MSPB, who determine whether sufficient "good cause" exists to remove an SEC ALJ, are also protected by tenure.  They are removable by the President "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

**The Removal Regime Applicable to SEC ALJs Violates Article II's Conferral of Executive Power in the President of the United States**

57.     As executive officers, in accordance with the Supreme Court's analysis and holding in *Free Enterprise*, SEC ALJs may not be protected by more than one layer of tenure protection.

58.     Article II of the U.S. Constitution vests "[t]he executive Power ... in a President of the United States of America," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; id., § 3.  In light of "[t]he impossibility that one man should be able to perform all the great business of the State," the Constitution provides for executive officers to

"assist the supreme Magistrate in discharging the duties of his trust." 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939); *see also Free Enterprise*, 561 U.S. 477, 130 S. Ct. at 3146.

59.     Article II's vesting authority requires that the principal and inferior officers of the Executive Branch be answerable to the President and not be separated from the President by attenuated chains of accountability.  In particular, as the Supreme Court held in *Free Enterprise*, Article II requires that executive officers, who exercise significant executive power, be unprotected from removal by their superiors at will, when those superiors are themselves protected from removal by the President at will.

60.     SEC ALJs, both generally and in this matter, exercise significant executive power.

61.     The removal standards applicable to SEC ALJs are unconstitutional because SEC ALJs are inferior officers for purposes of Article II, Section 2 of the U.S. Constitution, and because:

    a.  SEC ALJs are protected from removal by a statutory "good cause" standard;

    b.  The SEC Commissioners who are empowered to seek removal of SEC ALJs – within the constraints of the "good cause" standard – are themselves protected from removal by a standard of "inefficiency, neglect of duty, or malfeasance in office;" and

    c.  The MSPB members who are empowered to effectuate the removal decision – again governed and limited by a "good cause" standard – are themselves protected from removal by an "inefficiency, neglect of duty, or malfeasance in office" standard.

62.     As in *Free Enterprise*, here, under this attenuated removal scheme, "the President cannot remove an officer who enjoys more than one level of good-cause protection, even if the President determines that the officer is neglecting his duties or discharging them improperly. That judgment is instead committed to another officer, who may or may not agree with the

President's determination, and whom the President cannot remove simply because that officer disagrees with him. This contravenes the President's 'constitutional obligation to ensure the faithful execution of the laws.'" *Free Enterprise*, 130 S. Ct. at 3147 (quoting *Morrison v. Olson*, 487 U.S. 654, 693 (1988)).

63. Because the President cannot oversee SEC ALJs in accordance with Article II, SEC administrative proceedings such as the one at bar violate the Constitution.

### The Appointment Process for SEC ALJs Violates the SEC Commissioners' Duties Established by Congress

64. 15 U.S.C. § 78d(b)(1) provides that the "Commission," defined in 15 U.S.C. § 78d(a) as the SEC Commissioners, "shall appoint and compensate officers, attorneys, economists, examiners, and other employees in accordance with section 4802 of Title 5."

65. 15 U.S.C. § 78d-1(a) provides that the SEC Commissioners "shall have the authority to delegate, *by published order or rule*, any of its functions to a division of the Commission, an individual Commissioner, an administrative law judge, or an employee or employee board, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter."

66. The SEC has delegated the authority to appoint SEC ALJs without evidencing such delegation by "published order or rule."

### The SEC's Continuation of the Administrative Proceeding Will Cause Ms. Duka Severe and Irreparable Harm

67. Absent injunctive relief from this Court, Ms. Duka will be required to continue to participate in an unconstitutional and unlawful proceeding. The constitutional violation, standing alone, would constitute an irreparable injury. The absence of traditional procedural safeguards in SEC administrative proceedings further exacerbates that irreparable harm.

68.     Additionally, were the SEC permitted to continue the Administrative Proceeding while the instant complaint is pending, Ms. Duka would be denied any possibility of review until an appeal to a federal circuit court of appeals.  The substantial litigation and resource burdens incurred during the Administrative Proceeding would eventually be for naught, given the unconstitutionality of the Administrative Proceeding, and then, after the time-consuming and burdensome hearing in the Administrative Proceeding, the SEC likely would attempt to bring a new case in federal court.   Two litigations of this matter would compound costs, lost time, and reputational harm to Ms. Duka.

69.     And, were Ms. Duka to fail to prevail in the Administrative Proceeding, the damage could be severe and irreversible.  The result would be public, thus damaging her reputation, and any sanctions could cause damage well before Ms. Duka could obtain meaningful judicial review of her Article II claim.   The availability of an appeal after the Administrative Proceeding to a federal circuit court of appeals does not address this harm because the administratively-imposed sanction already may have taken effect – and the damage therefore already substantially and harmfully done – by the time the appellate court were to rule.

70.     Likewise, the harm threatened here cannot be remedied after the fact by money damages.  Governmental immunity doctrines substantially constrain Ms. Duka's ability to seek damages from the SEC.  Furthermore, even if money damages were available, the reputational harm to Ms. Duka should the SEC impose administrative sanctions would likely be impossible to monetize.

71.     By contrast, the SEC will suffer **no** harm from a pause in the Administrative Proceeding pending final resolution of the constitutional issue presented here.  Indeed, any such claim of harm would be fanciful, given that the SEC may proceed now in federal court.

Moreover, the presales that are the subject of the SEC's investigation and imminent enforcement action were issued approximately four years ago and have caused no pecuniary harm to investors, who hold performing securities.  Therefore, no investor would be adversely affected by the requested injunctive relief.

## COUNT ONE
## APPLICATION FOR INJUNCTIVE RELIEF

72.     Plaintiff repeats and re-alleges paragraphs 1 - 71 as if set forth in full.

73.     Plaintiff's constitutional rights will be irreparably harmed if a permanent injunction (and, if necessary, a preliminary injunction and temporary restraining order) are not issued against the Administrative Proceeding.   Plaintiff has a substantial likelihood of success on the merits of her claim.  Plaintiff will be irreparably injured without injunctive relief, as described above, and the harm to Plaintiff, absent injunctive relief, far outweighs any harm to the SEC (of which there can be none in this case) arising from an injunction.  Finally, issuance of an injunction will serve the public interest in protecting the rights of citizens under the Constitution and promoting respect for law.

## COUNT TWO
## DECLARATORY JUDGMENT

74.     Plaintiff repeats and re-alleges paragraphs 1 - 73 as if set forth in full.

75.     Plaintiff respectfully requests a declaratory judgment that appointment of SEC ALJ Elliot was unconstitutional, rendering the Administrative Proceeding unlawful.

## COUNT THREE
## DECLARATORY JUDGMENT

76.     Plaintiff repeats and re-alleges paragraphs 1 - 75 as if set forth in full.

77.     Plaintiff respectfully requests a declaratory judgment that the appointments of SEC ALJs have been unconstitutional.

## COUNT FOUR
## DECLARATORY JUDGMENT

78.     Plaintiff repeats and re-alleges paragraphs 1 - 77 as if set forth in full.

79.     Plaintiff respectfully requests a declaratory judgment that, pursuant to the principles of *Free Enterprise*, the statutory and regulatory provisions providing for the position and tenure protections of SEC ALJs are unconstitutional.

## COUNT FIVE
## DECLARATORY JUDGMENT

80.     Plaintiff repeats and re-alleges paragraphs 1 - 79 as if set forth in full.

81.     Pursuant to the APA, 5 U.S.C. § 706, this Court may hold unlawful and set aside agency actions, findings, and conclusions found to be not in accordance with the law, without observance of procedure required by law, or in excess of statutory authority.

82.     Plaintiff respectfully requests a declaratory judgment that the SEC has violated 15 U.S.C. § 78d-1(a) by delegating the authority to appoint SEC ALJs without doing so by published order or rule.

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      An order and judgment declaring that the Appointments Clause has been violated because the SEC Commissioners have not appointed SEC ALJs.

B.      An order and judgment declaring unconstitutional the statutory and regulatory provisions providing for the position and tenure protection of SEC ALJs.

C.      An order and judgment declaring that the SEC has violated 15 U.S.C. § 78d-1(a).

D.      An order and judgment enjoining the Commission from continuing the Administrative Proceeding against Plaintiff.

E.      Such other and further relief as this Court may deem just and proper, including reasonable attorneys' fees and the costs of this action.

**PETRILLO KLEIN & BOXER LLP**

By: _____

Guy Petrillo
(gpetrillo@pkbllp.com)

Nelson Boxer
(nboxer@pkbllp.com)

Dan Goldman
(dgoldman@pkbllp.com)

655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0331
Facsimile:  (212) 370-0391

*Attorneys for Barbara Duka*

# EXHIBIT 1

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

RECEIVED
JUN 04 2015
OFFICE OF THE SECRETARY

ADMINISTRATIVE PROCEEDING
File No. 3-15519

|  |  |
|---|---|
| | : |
| **In the Matter of** | : |
| | : |
| **Timbervest, LLC,** | : |
| **Joel Barth Shapiro,** | : |
| **Walter William Anthony Boden, III,** | : |
| **Donald David Zell, Jr.,** | : |
| **and Gordon Jones II,** | : |
| | : |
| **Respondents.** | : |
| | : |

## NOTICE OF FILING

On May 27, 2015, the Commission ordered the Division of Enforcement ("Division") to

file and serve on Respondents by June 4, 2015, an affidavit and any supporting materials "setting

forth the manner in which administrative law judge ("ALJ") Cameron Elliot and Chief ALJ

Brenda Murray were hired, including the method of selection and appointment." The Division

hereby submits the attached Affidavit, which contains the factual information the Division

believes legally relevant to resolving Respondents' Article II-based constitutional claims—

namely that, consistent with his status as an agency employee and not a constitutional officer,

ALJ Elliot was not hired through a process involving the approval of the individual members of

the Commission.[1]

---

[1]      Respondents' contention that ALJ Elliot's hiring violated the Appointments Clause rests
on the false premise that he is an inferior constitutional officer. As the Division has explained
(Memorandum of Law in Response to the Commission's Order Requesting Supplemental
Briefing at 4-13), ALJ Elliot is an employee, not an inferior officer. To the extent the

The Division also submits the following background information regarding the selection

and hiring of Commission ALJs:  Pursuant to current statutes and regulations, the hiring process

for Commission ALJs is overseen by the U.S. Office of Personnel Management ("OPM"), which

administers the competitive examination for selecting all ALJs across the federal

government. *See* 5 U.S.C. §§ 1104, 1302; 5 C.F.R. § 930.201(d)-(e).  As do other agencies, the

Commission hires its ALJs through this OPM process. *See* 5 U.S.C. § 3105; 5 C.F.R.

§ 930.201(f).  When the Commission seeks to hire a new ALJ, Chief ALJ Murray obtains from

OPM a list of eligible candidates; a selection is made from the top three candidates on that

list. *See* 5 U.S.C. §§ 3317, 3318; 5 C.F.R. §§ 332.402, 332.404, 930.204(a).  Chief ALJ Murray

and an interview committee then make a preliminary selection from among the available

candidates.  Their recommendation is subject to final approval and processing by the

Commission's Office of Human Resources.[2]

It is the Division's understanding that the above process was employed as to ALJ Elliot,

who began work at the agency in 2011.  As for earlier hires, it is likely the Commission

employed a similar, if not identical, hiring process.  But the Division acknowledges that it is

possible that internal processes have shifted over time with changing laws and circumstances,

---

Commission disagrees with the Division on this point, the Division believes that the facts set
forth in the affidavit—*i.e.*, facts relating to ALJ Elliot's hiring—are sufficient for the
Commission's consideration of Respondents' Appointments Clause challenge.  Further, the
Division notes that it was limited in its ability to collect information regarding ALJ hiring in light
of *ex parte* considerations related to pending litigation.

[2]     OPM retains oversight over each agency's "decisions concerning the appointment, pay,
and tenure" of ALJs, 5 C.F.R. § 930.201(e)(2), and establishes classification and qualification
standards for ALJ positions, *id.* § 930.201(e)(3).  ALJs also are paid according to a statutorily
prescribed pay schedule.  5 U.S.C. § 5372; 5 C.F.R. §§ 930.205, 206; *see also*
http://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-
sheets/administrative-law-judge-pay-system/ (ALJ pay system).

and thus the hiring process may have been somewhat different with respect to previously hired

ALJs. For instance, Chief ALJ Murray began work at the agency in 1988 and information

regarding hiring practices at that time is not readily accessible.


This 4th day of June, 2015.

Respectfully submitted,

*/s/ M. Graham Loomis*

M. Graham Loomis
Robert K. Gordon
Anthony J. Winter
Attorneys for Division of Enforcement
Securities and Exchange Commission
950 E. Paces Ferry Road NE
Atlanta, Georgia 30326-1232

## CERTIFICATE OF SERVICE

The undersigned counsel for the Division of Enforcement hereby certifies that the foregoing document has been served as follows:

Brent J. Fields
Office of the Secretary
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-1090
(Original and 3 copies by hand delivery)

Stephen D. Councill, Esq.
Julia Blackburn Stone, Esq.
Rogers & Hardin, LLC
2700 International Tower
229 Peachtree Street
Atlanta, GA 30303
(By UPS and electronic mail)

Nancy R. Grunberg, Esq.
Gregory Kostolampros, Esq.
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, DC 20006
(By UPS and electronic mail)

                              */s/ M. Graham Loomis*
                              M. Graham Loomis
                              Attorney for Division of Enforcement

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING
File No. 3-15519

_____
                                    :
**In the Matter of**                :
                                    :
**Timbervest, LLC,**                :
**Joel Barth Shapiro,**             :
**Walter William Anthony Boden, III,** :
**Donald David Zell, Jr.,**         :
**and Gordon Jones II,**            :
                                    :
**Respondents.**                    :
_____:

## AFFIDAVIT OF JAYNE L. SEIDMAN

Jayne L. Seidman, states that:

1.     I am a Senior Officer at the Commission and Deputy Chief Operating Officer.

2.     I make this Affidavit in response to the Commission's May 27, 2015, Order Requesting Additional Submissions and Additional Briefing.

3.     In its May 27, 2015, Order, the Commission directed the Division to file and serve on Respondents by June 4, 2015, an affidavit and any supporting materials "setting forth the manner in which ALJ Cameron Elliot and Chief ALJ Brenda Murray were hired, including the method of selection and appointment."

4.      Based on my knowledge of the Commission's ALJ hiring process, ALJ Elliot was

not hired through a process involving the approval of the individual members of the

Commission.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 4 th day of June, 2015.

Jayne L. Seidman
Deputy Chief Operating Officer

District of Columbia: SS

Subscribed and sworn to before me, in my presence,

this 4th day of June , 20 15

by Jayne L. Seidman

My Commission Expires April 30, 2020        Notary Public